**Edward B. BLOCK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–1766C.**

United States Court of Federal Claims.

June 1, 2005.

Paul R. Beckert, Jr., Langhorne, PA, for plaintiff.

Walter W. Brown, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General and Director John Fargo, for defendant. Jon Tornquist, U.S. Department of Justice, of counsel.

## OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

FIRESTONE, Judge.

Pending before the court is the United States' ("defendant's" or "government's") motion for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") with respect to the plaintiff, Edward B. Block's, ("plaintiff's") claims for damages for breach of an implied-in-fact contract and for just compensation under the Fifth Amendment for a taking of property. Also pending is the government's motion to dismiss the plaintiff's conversion claim for lack of subject matter jurisdiction under RCFC 12(b)(1). The plaintiff's claims arise from the government's alleged use of proprietary information contained in the plaintiff's unsolicited proposal for a government contract. The government argues that the plaintiff's claims for breach of an implied-in-fact contract and for just compensation for a taking fail because the plaintiff failed to mark his unsolicited proposal with a restrictive legend identifying any proprietary information, as required by applicable agency guidelines.[1] The government contends that the court lacks subject matter jurisdiction over the plaintiff's conversion claim because it sounds in tort. For the reasons that follow, the government's motion for summary judgment and to dismiss is **GRANTED** and the claims sounding in tort will be transferred.

## BACKGROUND

The following facts are not disputed unless otherwise noted.[2] This case concerns the plaintiff's unsolicited proposal to the government offering to provide services in connection with the study and testing of wiring in aging aircraft. Federal authorities became concerned with the wiring in aging aircraft after an investigation indicated that wiring failures were the possible cause of the TWA 800 accident off the shore of Long Island, New York. In response, President Clinton established the "Gore Commission" to study aircraft safety and security issues, including wiring. In its Final Report, the Gore Commission recommended, *inter alia*, that the Federal Aviation Administration ("FAA"), in

---

1. The government also seeks summary judgment on the plaintiff's implied-in-fact contract claim, which is based on the plaintiff's assertion that the government did not treat his proposal in a fair and honest manner. The plaintiff raised this claim for the first time in its brief in opposition to the government's motion for summary judgment. The government contends that unsolicited proposals do not give rise to an implied-in-fact contract for fair consideration.

2. In accordance with RCFC 56(h)(1), the government filed proposed findings of uncontroverted fact. The plaintiff did not file a response to these proposed findings. Therefore, only those material facts which are controverted by affidavit or other written or oral evidence will be deemed in dispute.

cooperation with airlines and manufacturers, expand its Aging Aircraft program to cover non-structural systems such as wiring. Specifically, the Commission noted that there was insufficient knowledge "about the potential effects of age on non-structural components of commercial aircraft" such as "electrical wiring; connectors, wiring harnesses, and cables; and fuel, hydraulic and pneumatic lines; and electro-mechanical systems such as pumps, sensors, and actuators." Defendant's Appendix ("Def.App.") at A10, Gore Commission Final Report at 10. The Commission recommended that the FAA take steps to address these concerns. *Id.* It is not disputed that the plaintiff is an expert in aircraft wiring and that he briefed representatives of the Commission. The Commission's findings were published in a final report on February 12, 1997. The FAA, in turn, addressed the Commission's recommendations in the FAA Aging Transport Non–Structural Systems Plan, which was published in July 1998.

Aware that the government would be addressing the issue of aircraft wiring, the plaintiff sought to craft a joint proposal between the FAA and the National Aeronautics and Space Administration ("NASA") regarding the problem of aging aircraft wiring. It is not disputed that the plaintiff exchanged various drafts of proposals with individuals associated with NASA. In particular, the plaintiff sent drafts of a joint proposal to Mr. Ahmad Hammond at the NASA Lewis Research Center in Cleveland, Ohio. He also referenced working with Mr. Dick Patterson at NASA. The plaintiff apparently does not dispute that the drafts exchanged between the plaintiff and government personnel at NASA were not marked "confidential" or "proprietary". In addition, the plaintiff does not dispute that he never asked anyone at NASA to whom he submitted a draft proposal to sign a confidentiality agreement or non-disclosure agreement. Def.App. at A160, Block Dep. at 97.

On March 17, 1999, the plaintiff submitted an unsolicited proposal to the FAA entitled "Joint Proposal for Wiring" ("Joint Proposal") in which he proposed to identify and test defective wiring on aircraft. It is not disput-

ed that the Joint Proposal did not contain a restrictive legend, on either the title sheet or on any individual sheet, indicating the presence of trade secrets or proprietary information. In addition, the plaintiff did not mark the Joint Proposal as "confidential" or "proprietary". *See* Def.App. at A163, Block Dep. at 104.

After reviewing the plaintiff's proposal, the FAA informed the plaintiff that it had rejected his proposal on April 14, 1999. Def.App. at A128. The plaintiff objected to the rejection by letter on April 19, 1999. Def.App. at A129–30. It is not disputed that the plaintiff did not indicate in his objection letter that his proposal contained any proprietary or confidential information. The plaintiff sent another letter to the FAA in May 1999, again objecting to the rejection of his proposal. Def.App. at A131–32. Again, the plaintiff did not indicate that his March 1999 Joint Proposal contained any proprietary or confidential information.

In February 2002, the plaintiff informed the FAA via e-mail that he believed that various FAA solicitations "parallel my Joint Proposal submitted with NASA on 17 March 1999." Def.App. at A133. In that same e-mail, the plaintiff objected to the "use of [his] material without compensation". *Id.* He did not, however, claim that his proposal contained trade secrets or any proprietary information.

The FAA responded to the plaintiff's e-mail by letter dated February 15, 2002. The letter stated that "current and closed solicitations are statements of FAA requirements neither discovered by you nor proprietary to you." Def.App. at A133. The plaintiff did not respond to the letter. Instead, he filed a bid protest in the FAA Office of Dispute Resolution for Acquisition. The protest alleged that the FAA had "misappropriated information set forth in an unsolicited proposal submitted to the FAA by [the plaintiff] in 1999 .... More specifically, [the plaintiff] claims that recent FAA solicitations and contracts utilize information supplied by [the plaintiff] concerning wiring systems in commercial aircraft." Def.App. at A135. His bid protest was rejected for lack of standing, on the ground that he had not submitted any bid.

The plaintiff filed the present action in July 2003 claiming that the FAA and NASA "appropriated plaintiff's proposal, work, trade secret and intellectual property, without his consent and without compensation" when the FAA allegedly used the information contained in his unsolicited proposal for internal purposes and in solicitations for testing aging wiring.[3] The plaintiff argues that under the FAA's acquisition regulations, the FAA is not allowed to use any unsolicited proposal without the consent of the offeror.[4] The plaintiff relies on the FAA's Acquisition Management System ("AMS") regulations which state as follows:

> FAA personnel should not use any data, concept, idea or other part of an unsolicited proposal as the basis, or part of the basis, for a SIR or in communications with any other firm unless the offeror is notified of and agrees to the intended use. However, this prohibition does not preclude using any data, concept, or idea available to the FAA from other sources without restrictions.
>
> FAA personnel should not disclose *restrictively marked information* included in an unsolicited proposal. The disclosure of such information concerning trade secrets, processes, operations, style of work, apparatus, and other matters, except as authorized by law, may result in criminal penalties under 18 U.S.C. § 1905.

Def.App. at A199, AMS at 3.2.2.6.2.1.2 (emphasis added).

The plaintiff has stated that he was not familiar with the FAA's regulations regarding the identification of proprietary or confidential information in unsolicited proposals when he submitted his proposal to the FAA. Def.App. at A152–53, A166–67. It is not disputed that under the FAA Procurement

Toolbox Guidance ("PTG") provided along with the FAA's AMS, offerors are advised to "identif[y] . . . any proprietary data" in their unsolicited proposals. Def.App. at A201 (PTG at T3.2.2.6 (A)(2)(m)).[5]

The plaintiff seeks damages for a breach of an implied-in-fact contract, for a taking of his property under the Fifth Amendment to the United States Constitution and for conversion of his property. In addition, the plaintiff argues that the government breached an implied-in-fact contract to fairly and honestly evaluate his proposal. In his complaint the plaintiff is seeking damages of $4 million, which he claims includes payment for 18 years of research and development, lost profits, unjust enrichment, and royalty rights.

## DISCUSSION

### 1. Motion to Dismiss

#### a. Standard of Review

The government has moved to dismiss the plaintiff's claim for conversion of his property under RCFC 12(b)(1) for lack of subject matter jurisdiction. In considering a motion to dismiss for lack of subject matter jurisdiction, the court construes the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Ultimately the burden is on the plaintiff to establish that the court has subject matter jurisdiction to hear the case. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir.1988). If the court finds that it does not have subject matter jurisdiction over the claim, it may, "if it is in the interest of justice", transfer the action to the court where the action "could have been brought at the time it was filed or noticed, and the

---

3. The plaintiff originally brought suit in the United States District Court for the Eastern District of Pennsylvania against the United States and the Boeing Company for misappropriation of the plaintiff's trade secrets. That suit was dismissed for lack of jurisdiction as to the United States. As to Boeing, the case was dismissed on summary judgment. *Block v. Blakely*, No. 02–8053, 2004 WL 1902520 (E.D.Pa. August 24, 2004).

4. Under 49 U.S.C. § 40110(d)(2)(G) (2005), the FAA was exempted from all Federal Acquisition

Regulations, in order to provide the FAA with greater flexibility in the procurement process. In response, the FAA created the Acquisition Management System.

5. Under the FAR § 15.609, in order to protect the proposal against unauthorized government use, offerors must include a legend indicating the offeror's desire to restrict the government's use on the title page of the unsolicited proposal.

action ... shall proceed as if it had been filed in ... the court to which it is transferred on the date upon which it was actually filed in ... the court from which it is transferred." 28 U.S.C. § 1631 (2005).

### b. Conversion Claim

■ The government argues that the plaintiff's claims for conversion and for misappropriation of a trade secret sound in tort and are therefore outside the subject matter jurisdiction of this court. The court agrees and transfers the claims.

It is well-settled that a claim for conversion of property or for misappropriation of trade secrets sounds in tort. *See Walter E. Heller & Co. Southeast, Inc. v. United States,* 231 Ct.Cl. 713, 713, 1982 WL 25202 (1982) (noting that a claim for conversion of property is "a tort claim"); *Sterner v. United States,* 198 Ct.Cl. 979, 1972 WL 5158 (1972) (holding that a claim for "misappropriation of a trade secret sounds in tort and is cognizable, if at all, only under the Federal Tort Claims Act"). It is equally well-settled that the Court of Federal Claims does not have jurisdiction over matters sounding in tort. 28 U.S.C. § 1491(a)(1) (2005); *Keene Corp. v. United States,* 508 U.S. 200, 214, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (noting that "tort cases are outside the jurisdiction of the Court of Federal Claims"); *Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997) ("The Court of Federal Claims ... lacks jurisdiction over tort actions against the United States."); *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493, 498 (1978) ("The court specifically lacks jurisdiction in cases sounding in tort.").

At oral argument via telephone on May 20, 2005, the plaintiff conceded that this court does not have jurisdiction over his conversion or misappropriation claims, but asked that this court transfer those claims back to the United States District Court for the Eastern District of Pennsylvania, where the suit was originally brought. The government did not object to such a transfer. As noted above, both of those claims sound in tort. Tort claims against the United States are cognizable only pursuant to the Federal Tort Claims Act, and district courts have exclusive juris-

diction over actions under that Act. 28 U.S.C. § 1346(b)(1). Therefore, the plaintiff's conversion and misappropriation claims, which were originally brought in U.S. District Court for the Eastern District of Pennsylvania, should be transferred back to that court. The court finds that it is in the interest of justice to have the claims returned. *See* 28 U.S.C. § 1631; *United States v. County of Cook, Illinois,* 170 F.3d 1084, 1089 (Fed.Cir. 1999) (holding that § 1631 permits "the transfer of less than all of the claims in an action").

## 2. Summary Judgment

### a. Standard of Review

The government has also moved for summary judgment on the plaintiff's other claims pursuant to RCFC 56. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on the motion, the court conducts "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact". *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, and once this burden is met, the non-moving party must, in order to defeat summary judgment, identify evidence demonstrating such a genuine issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### b. Implied–In–Fact Contract to Protect Proprietary Data

■ The government has moved for summary judgment on the plaintiff's implied-in-fact contract claim regarding the FAA's use of the proprietary information in the plaintiff's Joint Proposal on the ground that the

plaintiff has failed to show that he complied with the identification and restrictive marking requirements necessary to establish an implied-in-fact contract with the government.[6] The government argues that in order to establish an implied-in-fact contract between the government and an offeror to protect proprietary information submitted as part of an unsolicited proposal, the offeror must identify the material he wishes to protect in order to trigger the government's obligation to protect said material. The government contends that under the seminal case of *Airborne Data, Inc. v. United States,* 702 F.2d 1350 (Fed.Cir.1983), the government's agreement to protect proprietary data is based on the offeror's compliance with agency regulations that require identification of any proprietary information. In particular, the government focuses on the Federal Circuit's finding in *Airborne* that the offeror used a restrictive legend in accordance with the Federal Acquisition Regulations ("FAR") and thus there was a "meeting of the minds" regarding the protection the government would provide for such data. *Id.* at 1359–60.

While this case involves the FAA's procurement regulations and not the FAR, which was at issue in *Airborne,* the government contends that the differences between the FAA's rules and the FAR are not significant. Both the FAR and the FAA regulations require a contractor to identify any proprietary data in a proposal.[7] In particular, the FAA's Procurement Toolbox Guidance section T3.2.2.6(A)(2)(m) states that unsolicited proposals should contain the "identification of any proprietary data." Def.App. at A201. The companion regulation states that "FAA personnel should not disclose restrictively marked information included in an unsolicited proposal." Def. App. at A199, AMS at 3.2.2.6.2.1.2. Here, because, as the plaintiff admits, the plaintiff failed to identify any proprietary information in his Joint Proposal, the government contends that the FAA did not impliedly contract to protect the Joint Proposal from disclosure or use by the government.

The plaintiff argues in response that under the first paragraph of AMS 3.2.2.6.2.1, the government is obligated to protect all information in unsolicited proposals regardless of whether any proprietary information is identified by the offeror. As noted above, this provision states that absent another public source for data or information contained in an unsolicited proposal, "FAA personnel should not use any data, concept, idea, or any other part of an unsolicited proposal as the basis, or part of the basis for a SIR or in communications with any other firm unless the offeror is notified of and agrees to the intended use." The plaintiff contends that this first paragraph of the regulation creates a contract between the plaintiff and the government.

The government argues that the plaintiff's reliance on this section of the regulation is misplaced. The government contends that the first paragraph of the regulation simply sets forth a general policy statement of procedure, and does not create an implied contract right.[8] *See Pressman v. United States,* 33 Fed.Cl. 438, 444 (1995) (holding that the government's internal regulation directing employees to protect data does not give rise to an implied-in-fact contract to protect proprietary data). The government argues that in order to establish a contract to protect

---

**6.** The government does not concede that the plaintiff's Joint Proposal contained any proprietary information or trade secrets. Nor does the government concede that it used any of the plaintiff's allegedly protected material from his Joint Proposal. However, the government argues for the purposes of this motion that these issues are not material to its motion for summary judgment.

**7.** The FAA regulations and guidance therefore follow the FAR regarding the submission and protection of proprietary data. The FAR establishes more specific rules governing the identification of any proprietary information in a proposal and requires the contractor to place restrictive legends on each page of a proposal in order to guarantee protection. *See* 48 C.F.R. §§ 15.605, 15.608, 15.609 (2005).

**8.** This view is consistent with the language on the cover sheet that the FAA places on unsolicited proposals under PTG T3.2.2.6(A)(4)(b), which prohibits government personnel from disclosing or using data from an unsolicited proposal, but warns that this prohibition should not be "construed to impose any liability upon the Government or Government personnel for disclosure or use of data contained in this proposal."

information there must be evidence of an agreement to protect proprietary data. Therefore, the government asserts that an implied-in-fact contract is formed only when the offeror puts the government on notice through some type of marking that the offeror wants the information to remain confidential. In short, the government is contractually bound to protect only proprietary information that the offeror indicates, in accordance with the procedures the government has established, that the offeror wants to keep confidential. The government points to *Xerxe Group Inc. v. United States,* 278 F.3d 1357, 1360 (Fed.Cir.2002), to support its view. In *Xerxe* the Federal Circuit held, in a case arising under the FAR, that the government is only contractually obligated to protect proprietary information on the specific pages bearing a restrictive legend. *Id.* The Federal Circuit affirmed the trial court's rejection of Xerxe's claim that the government had breached an implied-in-fact contract to protect all of the information in a proposal because Xerxe had placed a restrictive legend on the title page. "[Xerxe's] failure to identify and clearly demarcate [on each page] what it considered restricted data is fatal to its claim." *Id.*

In keeping with *Airborne* and *Xerxe,* the court agrees with the government that the plaintiff's failure here to identify any proprietary information in his unsolicited Joint Proposal requires dismissal of the plaintiff's implied-in-fact contract claim for protection of his alleged proprietary information. It is not disputed that the plaintiff did not identify or restrictively mark his unsolicited proposal to the FAA. In addition, the plaintiff does not dispute that he did not take any other action to protect the information in the proposal he submitted to the FAA. Because the plaintiff did not mark the Joint Proposal or otherwise indicate to the FAA that he wished to keep the information he submitted confidential, the government could not manifest its intent to protect the information. In order to accept the government's contractual offer to maintain confidentiality, the offeror must submit a proposal that comports with the terms of the agency regulations governing

confidentiality. Here, the FAA required that the plaintiff identify any proprietary information in his proposal. PTG at T3.2.2.6(A)(2)(m). However, the plaintiff did not comply with this minimal requirement. The plaintiff's failure to do so is fatal to his implied-in-fact contract claim.

■ The plaintiff's reliance on the first paragraph of AMS 3.2.2.6.2.1.2 to suggest that the government had contractually agreed to protect all information in his unsolicited proposal is misplaced. The court agrees with the government that the paragraph admonishing FAA personnel against using the information in unsolicited proposals did not create an implied-in-fact contract. As noted *supra,* note 8, the FAA stated in its procurement regulations that even though the regulation required protection of unsolicited proposals, the FAA did not agree to be liable for disclosing or using data contained in such proposals.

The cover sheet that the FAA requires its employees to place on unsolicited proposals states: "This is a Government notice and shall not by itself be construed to impose any liability upon the Government or Government personnel for disclosure or use of data contained in this proposal." PTG at T3.2.2.6(A)(4)(b). This disclaimer indicates that the government has not contractually agreed not to disclose or use the data in unsolicited proposals for its own purposes in all cases. To the contrary, the FAA's implied contractual obligation to protect data or information arises only when the offeror has indicated to the government a desire to protect such information. The necessary "meeting of the minds" therefore arises when the offeror identifies the proprietary information which the government then agrees to protect. Because the plaintiff failed to identify any proprietary information that it wished to protect, there was no "meeting of the minds" and the government is entitled to summary judgment on the plaintiff's implied-in-fact contract claim.[9]

---

9. Indeed, when read as a whole, the regulations only provide for government liability in connection with the disclosure of trade secrets. *See* AMS 3.2.2.6.2.1.2.

### c. Fifth Amendment Taking Claim

■ The plaintiff argues that the government is also liable for taking his property without just compensation in violation of the Fifth Amendment of the United States Constitution. He argues that the government took the alleged proprietary information in his Joint Proposal and used it for its own purposes. Without admitting that it misappropriated the plaintiff's Joint Proposal, the government contends that the plaintiff's failure to restrictively mark his proposal is also fatal to his Fifth Amendment claim.

The government contends that in order to establish a compensable taking under the Fifth Amendment, the plaintiff must first establish the existence of a property interest that is protected by the Fifth Amendment's Taking Clause. With respect to proprietary information, the government contends that proprietary information is a protected property interest, but only if it is protected as a "trade secret." *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("[T]o the extent that [the plaintiff] has an interest in its ... data cognizable as a trade secret property right under [state] law, that property right is protected by the Taking Clause of the Fifth Amendment."). However, the government further argues that such property interest is only protected to the extent that the owner protects the trade secret from others. As the Supreme Court has stated: "Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." *Id.* at 1002, 104 S.Ct. 2862. Once the trade secret is disclosed to others, "who are under no obligation to protect the confidentiality of the information," the property right is extinguished. *Id.* The government argues, based on the holding in *Ruckelshaus,* that because the plaintiff here did not identify any proprietary information in his Joint Proposal, the government was not under any obligation to protect the confidentiality of the information and therefore the plaintiff lost any property interest he held in his Joint Proposal.

In response, the plaintiff contends that the government appropriated his proposal and therefore the government is liable for a taking. The plaintiff does not address the government's contention that only proprietary information that is protected by its owner as a trade secret gives rise to a protected property interest.

The court again agrees with the government. In order to have established a protected property interest in his Joint Proposal, the plaintiff was obligated to protect the information from disclosure to others. The plaintiff was therefore obligated to mark his proposal "confidential" or "trade secret." His failure to place any restrictive markings on his proposal before submitting it to NASA personnel or the FAA is fatal to his taking claim. The plaintiff did not take any of the minimal steps necessary to protect his alleged trade secrets from disclosure. He did not mark the proposal or seek any agreement for confidentiality. Because he disclosed his alleged trade secrets to others, "who were under no obligation to protect the confidentiality of the information," at both NASA and the FAA, the plaintiff lost any property interest he may have held. *Ruckelshaus,* 467 U.S. at 1002, 104 S.Ct. 2862. If there is no property interest there can be no taking. For this reason, the court agrees that the government is entitled to summary judgment on the plaintiff's Fifth Amendment taking claim.

### d. Implied–In–Fact Contract to Fairly and Honestly Consider Bids

■ The plaintiff also argues in his brief that the government breached an implied-in-fact contract to fairly and honestly evaluate his proposal. In particular, the plaintiff contends that the government breached this implied-in-fact contract when it failed to fairly consider his Joint Proposal and instead decided to use his proposal for its own purposes. The plaintiff states in his brief that "the unsolicited proposal was not dealt with in a fair manner on its merits, or honestly considered, but rather from the outset an attempt was made to take the proposal and seek a basis for rejection." Pl.'s Br. at 15.

The plaintiff bases this implied-in-fact contract claim on bid protest cases, which were filed prior to the enactment of the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b) ("ADRA"), that allows disappointed bidders pre-award to bring cases before the Court of Federal Claims under the theory that the government had entered into an implied-in-fact contract with prospective bidders to fairly and honestly consider their proposals. *See Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233, 1236 (1970) ("[I]t is an implied condition of a request for bids that each one will be honestly considered . . . ."). The plaintiff apparently assumes that an implied-in-fact contract established under this theory will support his monetary claim for $4 million.

The government contends that the plaintiff's claim for breach of an implied-in-fact contract to fairly consider fails because the theory does not extend "beyond the disappointed bidder fact pattern". *Tree Farm Dev. Corp. v. United States*, 218 Ct.Cl. 308, 585 F.2d 493, 499 (1978). The government argues that the implied-in-fact contract to fairly consider arises only in the context of bids considered in a competitive procurement process. In such cases, the government is obligated to fairly and honestly consider each responsive bid that it receives. The government further argues that where the government has discretion to consider or not consider a proposal, it does not impliedly contract to fairly or honestly consider the proposal. The government contends that because the FAA had the discretion not to consider the plaintiff's Joint Proposal in the first instance the FAA did not impliedly contract to consider the unsolicited proposal in any particular manner. Specifically, the government relies

on AMS 3.2.2.6.1, which states that the FAA "may consider and/or accept unsolicited proposals when it is determined to be in the best interests of the FAA". Def.App. at A198. Thus, the government contrasts this case with other cases in which the government was comparing competitive proposals or was required to take action under a statute,[10] wherein an implied contract was established. In this case, because the FAA simply could have elected not to consider the plaintiff's proposal, the government contends that there was no implied-in-fact contract to give his proposal any specific consideration. *See New America Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1080 (Fed.Cir.1989) (noting that the implied-in-fact contract theory would not apply to a non-competitive claim for a discretionary grant).

Before turning to the parties' arguments, the court notes that this court[11] has repeatedly stated that the implied-in-fact contract to fairly consider bids no longer survives as a basis for recovery in actions challenging consideration of a bid or proposal. *See Lion Raisins, Inc. v. United States*, 52 Fed.Cl. 115, 120 (2002) ("[N]o logical reason would support the presumption that Congress intended for the implied-contract cause of action to survive the enactment of the ADRA."); *Future–Tec Mgmt. Sys., Inc. v. United States*, No. 00–557C, slip op. at 14 (Fed.Cl. July 3, 2002) ("This implied-in-fact contract theory [to fairly and honestly consider bids] no longer survives as a basis of recovery in bid protest actions."); *Ramcor Servs. Group, Inc. v. United States*, 41 Fed.Cl. 264, 268 (1998) ("Prior to the 1996 Tucker Act amendments, the Court of Federal Claims, as well as its predecessor courts, found jurisdiction

---

**10.** The government notes that in two cases in which the court used an implied-in-fact contract theory to examine objections by minority-owned businesses to a non-competitive contract award, the agencies did not have the same level of discretion that has been provided to the FAA under the FAA's regulations. *See Celtech v. United States*, 24 Cl.Ct. 269 (1991), *vacated pursuant to settlement agreement by* 25 Cl.Ct. 368 (1992); *Refine Constr. Co. v. United States*, 12 Cl.Ct. 56 (1987). The government argues that therefore these cases are distinguishable.

**11.** The Federal Circuit has not squarely decided whether a cause of action based on an implied-in-fact contract to fairly and honestly consider bids survives the passage of the ADRA. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1082 n. 9 (Fed.Cir.2001) ("Similar to the *Impresa* court, 238 F.3d at 1332 n. 6, we decline to address whether the implied contract theory survives the ADRA."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n. 6 (Fed.Cir.2001) (noting that "we need not decide" whether the implied contract theory survives the 1996 amendments to the Tucker Act).

over procurement disputes by virtue of a fictional implied-in-fact contract requiring the Government to consider an offeror's bid in a fair and honest manner. The 1996 Tucker Act amendments obviate such a requirement." (citation omitted)), *aff'd in part and vacated in part*, 185 F.3d 1286, 1289 (Fed.Cir.1999); *contra Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed.Cl. 56, 60–61 (2000) ("the [1996] amendments do not supercede the implied contract theory of good faith and honest consideration...."), *aff'd*, 251 F.3d 170 (Fed.Cir. 2000) (table). Rather, as the court explained in *Future–Tec*, after the Tucker Act was amended in 1996 by the ADRA to give the Court of Federal Claims jurisdiction over both pre-award and post-award bid protest cases, the need to rely on a "virtual implied contract" to fairly and honestly consider bids was eliminated. Slip op. at 13–14. Therefore, the plaintiff's implied-in-fact contract claim fails because objections to the procurement process must be based on claims identified in the Tucker Act, 28 U.S.C. § 1491(b)(1). The plaintiff's theory of an implied-in-fact contract to fairly and honestly consider his proposal no longer gives rise to a potential claim.

Even if the court were to assume that this implied-in-fact contract theory survives, the court finds that the plaintiff's implied-in-fact contract claim must be dismissed because, as the government has correctly argued, the theory has not been extended to cases involving unsolicited proposals. The Federal Circuit has specifically stated that the implied-in-fact contract theory has not been extended beyond the competitive bidding process. The implied-in-fact contract to fairly and honestly consider bids "does not extend to a noncompetitive claim for a discretionary grant under any case law now available." *New America Shipbuilders*, 871 F.2d at 1080, (citing *Tree Farm*, 585 F.2d at 499). There is no basis for the court to extend the theory to consideration of unsolicited proposals. While the FAA provides rules for reviewing and ultimately accepting unsolicited proposals, it is not required and cannot be compelled to accept any unsolicited proposal. The FAA regulation plainly states that the "FAA *may* consider and/or accept unsolicited

proposals." Def.App. at A198, AMS 3.2.2.6.1 (emphasis added). Because the FAA is not required to consider or accept an unsolicited proposal, there cannot be an implied-in-fact contract to fairly and honestly consider such proposal. The plaintiff has failed to establish any contract right under the above-discussed implied-in-fact contract theory.

For all of these reasons the government is entitled to summary judgment on the plaintiff's implied-in-fact contract theory.

## CONCLUSION

Based on the foregoing reasons, the plaintiff's conversion and misappropriation claims shall be transferred and the government is entitled to summary judgment on the rest of the plaintiff's case. Accordingly, the Clerk is directed to transfer the plaintiff's conversion and misappropriation of trade secrets claims to the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1631 and to enter judgment on the plaintiff's breach of implied-in-fact contract and Fifth Amendment taking claims for the defendant. Each party to bear its own costs.

**IT IS SO ORDERED.**